**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SUSAN HANSEN,

                Plaintiff,

           -against-

THE TOWN OF SMITHTOWN, and MICHELE
DESANTI, CHRISTINA DEHOYOS, KAREN
SYLVESTER, JOHN VALENTINE, JAMES
LEE, JAMES GARCIA, KEVIN McPADDEN,
and LISA M. INZERILLO, in their official and
individual capacities,

                Defendants.

--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:18-cv-02438 (ADS)(AYS)

**APPEARANCES:**

**Famighetti & Weinick, PLLC**
*Counsel for the Plaintiff*
25 Melville Park Road, Suite 235
Melville, NY 11747
      By:    Mathew B. Weinick, Esq., Of Counsel

**Campolo, Middleton & McCormick, LLP**
*Counsel for the Defendants*
4175 Veterans Memorial Highway, Suite 400
Ronkonkoma, NY 11779
      By:    Meghan M. Dolan, Esq., Of Counsel

**SPATT, District Judge**:

On April 25, 2018, Susan Hansen ("Hansen" or the "Plaintiff") commenced this action

against Michele DeSanti ("DeSanti"), Christina Dehoyos ("Dehoyos"), Karen Sylvester

("Sylvester"), John Valentine ("Valentine"), James Lee ("Lee"), James Garcia ("Garcia"), Kevin

McPadden ("McPadden"), and Lisa M. Inzerillo ("Inzerillo") (together, the "Individual

Defendants"), and the Town of Smithtown (the "Town") (together with the Individual Defendants,

1

the "Defendants"), in response to her arrest in March of 2017. The Plaintiff alleges numerous causes of action, namely abuse of process under both federal and state law, malicious prosecution, and violation of her First Amendment right to Freedom of Assembly.

Presently before the Court is a motion by the Defendants, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 12(b)(6), seeking to dismiss the complaint for failure to state a claim upon which relief may be granted.

For the following reasons, the Defendants' motion to dismiss is granted in part.

## I. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Plaintiff's complaint, and for the purposes of the instant motion, are construed in favor of the Plaintiff.

The Town's shelter (the "Shelter" or "Animal Shelter") is located at 410 Middle Country Road, Smithtown, New York and houses dogs and cats. The Shelter is open seven days a week to make its animals available for adoption by members of the public. The Shelter is operated by the Town through a separate agency (the "Agency" or "Department"). The Town has direct authority over the Agency and controls daily operations, employment decisions, and control over its policies and procedures. Complaint ("Compl."), Docket Entry ("DE") 1, ¶¶ 8-10.

Hansen is a self-proclaimed animal welfare advocate and has volunteered at the Southold Animal Shelter, the Riverhead Animal Shelter, the Town of Brookhaven Animal Shelter and the American Society for the Prevention of Cruelty to Animals, as well as numerous animal rescue groups, including Responsible Solutions for Valued Pets. She also founded and ran a nonprofit organization focused on improving Long Island's animal shelters. On August 5, 2015, the Town hired Hansen as the supervisor of the Department. The complaint alleges that Hansen inherited a Department that had been the subject of numerous complaints that critiqued the Agency's

operations and accused its employees of animal cruelty.  Hansen became responsible for managing the overall operations of the Department, including managing personnel issues.  Compl. ¶¶ 20-28. Early in her tenure, the Plaintiff began to implement organizational and procedural changes with the goal of improving the Shelter.

In early 2016, Inzerillo, a newly installed councilwoman on the Town board, and Lynne Nowick, a fellow councilwoman, were appointed as Co-Liaisons to the Department.  Inzerillo and Nowick became responsible for overseeing the Agency and its operations.  For reasons not specified in the complaint, the Plaintiff alleges that almost immediately, Inzerillo became hostile to Hansen.  For example, on February 11, 2016, Inzerillo, along with McPadden and a small group of Town employees visited the Shelter and toured the facility.  During that visit, Inzerillo criticized Hansen's management style in the presence of the other visitors.  A couple of days later, Inzerillo sent Hansen an email, which accused her of improperly using the Shelter for meetings of volunteers, donors, and elected officials.  About this time, Inzerillo also placed a report in Hansen's personnel file, which allegedly accused Hansen of mismanagement.  Hansen was not informed of this, which purportedly violated the collective bargaining agreement between Hansen's union and the Town.  Shortly thereafter, Inzerillo relinquished her responsibilities as Co-Liaison to the Department.  Compl. ¶¶ 29-39.

In May 2016, Inzerillo, who was no longer Co-Liaison to the Department, emailed Hansen to ask her a series of questions regarding the Shelter's volunteers.  Hansen complained about this email to her union and to Nowick.  Nowick responded that she would discuss it with the Town Supervisor.  Compl. ¶¶ 42-44.

On November 26, 2016, DeSanti, an Education Specialist at the Shelter, quit her job.  She subsequently called Inzerillo to complain about Hansen.  A few weeks later, Inzerillo convened a

meeting with Hansen, her union representative, Nowick, the Director of Personnel, and the Town Attorney to discuss the Department. At that time, Hansen expressed her concerns about DeSanti and memorialized them in an email to the meeting attendees. Inzerillo responded to Hansen's email, defending DeSanti. Ultimately, DeSanti retained her position with the Shelter. Hansen again reported her issues with Inzerillo to Nowick. Compl. ¶¶ 48-56.

On January 18, 2017, Hansen's attorney sent a letter to the Town Supervisor regarding Inzerillo's actions. Four days later, Hansen terminated DeSanti's employment. DeSanti reportedly responded, "I don't think so. I'm going to call [Inzerillo]," and on her way out of the building, repeated "God help you" while making the sign of a cross. On January 27, 2017, five days after being terminated, DeSanti reported back to work. DeSanti did not do so with Hansen's knowledge or permission. Hansen reported this development to Nowick. Compl. ¶¶ 60-63.

On February 7, 2017, Hansen was served with a letter of suspension by three individuals from the Town's Public Safety Department. The letter informed Hansen that she was suspended with pay for 30 days and that the town was filing charges against her pursuant to Section 75 of the New York Civil Service Law. Hansen was also required to provide Public Safety with her keys to the Shelter. She complied with the directive and left the premises without incident. Compl. ¶¶ 64-69.

In the winter of 2017, the Agency advertised a volunteer orientation at the Shelter that was to take place on February 18, 2017. The advertisement noted that the Shelter was "in need of volunteers" and invited the public to bring proper identification. Throughout the timeframe relevant to this case, the Department has had volunteers from the general public. These individuals receive various assignments, from walking dogs to fostering animals. They must be at least 16 years old and comply with the Agency's Policy and Procedure Manual, which sets forth the rules

of the program. Volunteers are not required to be residents of the Town. Employees are allowed to volunteer, provided that any volunteer activity is outside the scope of their employment.

On February 18, 2017, during the course of her suspension, Hansen attended the advertised volunteer orientation at the Shelter with the alleged intention of volunteering. After taking a volunteer application, Garcia, who was employed by the Town as an Investigator, approached Hansen and informed her that he did not believe she was allowed at the Shelter. Garcia then called McPadden, the Deputy Chief of the Town's Public Safety Department, who informed him that Hansen was not allowed to be at the Shelter. At that time, Garcia asked Hansen to leave and she complied without incident. While leaving the property, the Plaintiff noticed Valentine, the Public Safety Director Chief at the Shelter, and inquired as to the situation. Valentine indicated that he supported whatever Garcia told Hansen. In a subsequent report, Garcia indicated that Hansen left the Shelter and he considered the matter closed. Compl. ¶¶ 70-91.

Approximately three weeks later, DeSanti provided a statement to the Suffolk County Police Department stating that she observed Hansen at the Shelter for the volunteer training and that the purpose of Hansen's attendance was "to harass [her]." DeSanti also purportedly stated that Hansen was previously told that she could not visit the Shelter. DeHoyos, a Kennel Attendant at the Shelter, Sylvester, an Investigator with the Town, and Lee, a Senior Investigator with the Town, all also provided statements to the police department that stated that Hansen had been told that during her 30-day suspension she was not allowed at the Shelter. Valentine provided a statement to police that specified that he did not give Hansen permission to visit the Shelter. Compl. ¶¶ 92-96.

On March 10, 2017, the Plaintiff was arrested outside her home for criminal trespass. She was handcuffed, brought to the precinct and was issued a desk appearance ticket. About that time,

Inzerillo allegedly instructed DeSanti to ask a Shelter volunteer to call a Newsday photographer to photograph Hansen's arrest. Inzerillo told DeSanti to erase the message that contained the instruction. Compl. ¶¶ 97-102.

In April 2017, the Town began a disciplinary hearing against Hansen, which subsequently resulted in her termination. Compl. ¶¶ 106-10. On December 22, 2017, the criminal charges against Hansen were dismissed on a motion from the Assistant District Attorney assigned to the case. Compl. ¶ 104.

## II. DISCUSSION

### A. STANDARD OF REVIEW: FED. R. CIV. P. 12(B)(6)

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See, e.g.*, *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016); *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Bold Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free Sch. Dist.*, 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

Under the *Twombly* standard, the Court may only dismiss a complaint if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has expounded that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do

6

not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 664, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to survive a motion to dismiss. FED. R. CIV. P. 8(a)(2). Under Rule 8, a complaint is not required to allege "detailed factual allegations." *Kendall v. Caliber Home Loans, Inc.*, 198 F. Supp. 3d 168, 170 (E.D.N.Y. 2016) (quoting *Twombly*, 550 U.S. at 555). "In ruling on a motion pursuant to FED. R. CIV. P. 12(b)(6), the duty of a court 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998)). The Court "[is] not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## B. AS TO THE *MONELL* CLAIMS

It is well established that "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978). In other words, local governments are only responsible for "their own illegal acts," and are not vicariously liable for their employees' actions. *Prmbaur v. City of Cincinati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). However, Section 1983 "extends liability to a municipal organization where that organization's failure to train, or the policies or customs it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *accord Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d

Cir. 2012) (same). "Municipal liability may also be premised on a failure to train employees when inadequate training 'reflects deliberate indifference to ... constitutional rights.'" *Okin v. Vill. of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 392, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

To prevail on a Section 1983 claim against a municipality, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)); *see also Monell*, 436 U.S. at 690–91 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels").

> A plaintiff can establish the existence of a municipal policy or custom by showing: the existence of[ ] (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision-making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge and acquiescence can be implied on the part of the policy making officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference to the rights of those who come in contact with the municipal employees.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations omitted); *Moran v. Cty. of Suffolk*, No. 11 Civ. 3704, 2015 WL 1321685, *9 (E.D.N.Y. Mar. 24, 2015) (same). At the motion to dismiss stage, a plaintiff must allege "sufficient factual detail" rather than "boilerplate allegations" that the municipalities custom or policy caused a violation of the plaintiff's constitutional rights. *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011).

The Plaintiff puts forth two theories of municipal liability. First, the Plaintiff asserts that Inzerillo, as a municipal policymaker, acted to cause the alleged constitutional deprivations. Second, Hansen contends that the Town's practice of unlawfully removing citizens from public facilities is so persistent and widespread, that it constitutes a custom. The Court will address each of these allegations in turn.

### 1. Actions Taken by Municipal Policymakers

Contrary to the Plaintiff's allegation, Inzerillo did not have the authority required to be considered a policymaker for the purposes of asserting a *Monell* claim. As stated above, a plaintiff can establish a custom or policy by showing that a policymaker with final decision-making authority took action that lead to the deprivation of the Plaintiff's rights. However, the "fact that a particular official—*even a policymaking official*—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 374 (S.D.N.Y. 1999) (emphasis in original) (citing *Pembaur*, 475 U.S. at 479). "[T]he decisionmaker must be responsible for establishing *final government policy* respecting the particular activity before the municipality can be liable." *Id*. (emphasis in original) (citing *Pembaur*, 475 U.S. at 479). The question is "not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker *with respect to the particular conduct challenged*" by the plaintiff. *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (emphasis added). This inquiry is determined by state law. *Baity v. Kralik*, 51 F. Supp. 3d 414, 436-37 (S.D.N.Y. 2014).

The complaint alleges that Inzerillo, an elected member of the Town's Board was at one point the Co-Liaison to the Animal Shelter. After her brief tenure as Co-Liaison, she stepped

aside, leaving Nowick as the sole Liaison. Although she was no longer formally responsible for the Animal Shelter, the complaint details a continued meddling in its affairs. For example, in May 2016, Inzerillo wrote Hansen to demand answers to a series of questions regarding the Shelter's operations. Later in the year, Inzerillo convened a meeting with Hansen, Nowick, the Director of Personnel for the Town and the Town Attorney.

This conduct is not illustrative of the kind of authority required for *Monell* liability. Inzerillo's actions are not indicative of any responsibility "for establishing final government policy" with respect to the Animal Shelter. *Ogden*, 70 F. Supp. 2d at 374 (citing *Pembaur*, 475 U.S. at 479). While she certainly continued to intrude into the Shelter's affairs after her removal as Co-Liaison, the activity alleged in the complaint does not contend that she made any final decision or established any official policy at the time of the relevant conduct alleged in this suit. Requesting information or convening a meeting, in and of itself, does not indicate the level of responsibility required by *Monell*. Inzerillo's conduct as it relates to the Plaintiff's causes of actions does not rise to a level that establishes liability for the Town. Hansen does not provide any factual allegations in her complaint from which the requisite level of authority could be inferred.

### 2. Custom

The Plaintiff also asserts that the Town's practice of unlawfully removing citizens from public facilities is so persistent and widespread, that it constitutes a policy or custom. A failure to train employees only amounts to a policy or custom if it demonstrates "deliberate indifference to the rights of persons with whom [untrained employees] come into contact." *Harris*, 489 U.S. at 388. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Comm'rs of Bryan City v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). As a result, policymakers

10

have to be on actual or constructive notice that a lack of training on a particular topic causes a deprivation of citizens' constitutional rights. *Id*. at 407.

In support of this *Monell* theory, the complaint cites a pending action in this District that claims the Town prohibited another individual, John Urbancik from "accessing public facilities." Compl. ¶ 120. Hansen does not describe any additional details regarding Urbancik's allegations nor does she provide any further examples of similar incidents. Even if the complaint contained a more detailed depiction of Urbancik's contentions, this fails to allege a pattern of unlawful restrictions of the Freedom of Assembly. *See Jones*, 691 F.3d at 85 (finding that two or three instances "fell far short of showing a policy, custom or usage"); *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) ("A municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." (citing *Monell*, 436 U.S. at 694)). The allegations before this Court are insufficient to allege an "unlawful municipal policy" under *Monell*.

The Plaintiff makes similar allegations regarding its Abuse of Process and Malicious Prosecution claims. In both causes of action, the complaint declares that deliberate indifference "can be inferred by a lack of training of Town personnel in how and when to report incidents of criminal trespass as evidenced by Defendants false statements to the police relating to the criminal trespass charge and thereby triggering Hansen's unlawful arrest." Compl. ¶ 122, 124. However, Hansen does not assert a pattern of similar violations or other related incidents.

Similarly, the Plaintiff does not contend that she can prevail on the "single-incident" liability that the Supreme Court noted in *Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). The need for training is not "so obvious" as to permit Hansen from demonstrating deliberate indifference in such a manner.

The Plaintiff fails to state a claim under *Monell* liability against the Town.  Accordingly, Hansen's *Monell* claims are dismissed.

## C.  FREEDOM OF EXPRESSION

The Plaintiff contends that her removal from the Shelter on February 18, 2017 infringed on her Freedom of Assembly, a right guaranteed by the First Amendment.  The Defendants maintain that her presence there did not constitute the type of activities typically protected by the First Amendment.

The First Amendment prevents the government from "abridging the freedom of speech, or freedom of the press," and assures "the right of the people peacefully to assemble."  U.S. Const. amend. I.  "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."  *De Jonge v. Oregon*, 299 U.S. 353, 364, 57 S. Ct. 255, 81 L. Ed. 278 (1937); *see also Wolff v. Selective Serv. Local Bd. No. 16*, 372 F.2d 817, 822 (2d Cir. 1967) ("[O]f all constitutional rights, the freedoms of speech and of assembly are the most perishable, yet the most vital to the preservation of American democracy.").  "The First and Fourteenth Amendment do not permit [the government] to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people."  *Coates v. City of Cincinnati*, 402 U.S. 611, 615, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971).  On the other hand, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985).

To determine whether the government's attempts to restrict constitutionally-protected activities is prohibited by the First Amendment, "the level of scrutiny to which the restriction is

subjected depends on how the property is categorized as a forum for speech." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 469 (S.D.N.Y. 2012). In the Second Circuit, there are four classifications of government property: (1) traditional public fora, (2) designated public fora, (3) limited public fora, and (4) nonpublic fora. *See R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011). Once the Court determines the forum, it "then applies the requisite standards for that forum to the challenged speech restriction." *AFDI*, 880 F. Supp. 2d at 469.

> Traditional public forums include areas such as streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly; as to a traditional public forum, the state may not enact content-based restrictions unless they are necessary to serve a compelling state interest.
>
> A designated public forum is a place that, although not traditionally open for public assembly and debate, the government has taken affirmative steps to open for general public discourse. Speech in a designated public forum is entitled to the same constitutional protection as that extended to expression in a traditional public forum, so long as the state continues to designate the forum for such use. However, the government may decide to close a designated public forum.
>
> A limited public forum is created when the State opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects. In a limited public forum, regulations governing the content of speech are allowed, so long as they are reasonable and viewpoint-neutral.
>
> A nonpublic forum is one that is neither traditionally open to public expression nor designated for such expression by the State; in such a forum, as in a limited public forum, content regulations are allowed if they are reasonable and viewpoint-neutral.

*Johnson v. Perry*, 859 F.3d 156, 172 (2d Cir. 2017) (internal citations, quotation marks and alterations omitted); *see also Byrne v. Rutledge*, 623 F.3d 46, 55 n.8 (2d Cir. 2010) ("[T]he law of this [Circuit] describes a limited public forum as both a subset of the designated public forum and a nonpublic forum opened to certain kinds of speakers or to the discussion of certain subjects." (internal citations and quotation marks omitted)).

The Plaintiff contends that on the day of the volunteer training, the Shelter was, at least, a limited public forum. While the shelter "is not traditionally open for public assembly and debate," *Johnson*, 859 F.3d at 53 (internal citations omitted), and thereby not a traditional or designated public forum, the Court must determine if the speakers or subject of the training were the kinds of speech or expression protected by the First Amendment.

"[C]onstitutional protection in a limited public forum is afforded only to 'expressive activity of a genre similar to those that [the] government has admitted to the limited public forum." *Liberty Christian Ctr., Inc. v. Bd. of Educ. of City Sch. Dist. of City of Watertown*, 8 F. Supp. 2d 176, 182 (N.D.N.Y. 1998) (quoting *Travis v. Oswego-Apalachin Sch. Dist.*, 927 F. 2d 688, 692 (2d Cir. 1991)).

The First Amendment protects two different types of association, "intimate association" and "expressive association." *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984).

> [The United States Supreme Court's] decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.

*Id*. at 617-18. Neither party contends that the participants of the volunteer orientation were engaged in the "intimate human relationships" that are typically protected. Only "expressive association" is at issue before the Court. The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and

14

cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000) (quoting *Roberts*, 468 U.S. at 622).

Both parties agree that the Plaintiff visited the Shelter to participate in the volunteer training. However, for the first time in this action, Hansen asserted in her opposition brief that she was also there "with the purpose of expressing her love of animals, furthering her advocacy of animal rights, and associating with others who share her love and advocacy for animals." DE 18 at 8. Contrary to the Plaintiff's contention, even reading the complaint in the light most favorable to the Plaintiff, she does not plead that she was there for any purpose outside of joining the Shelter's volunteer program, which consisted of activities such as walking dogs or fostering pets. Hansen notes that she "considers herself an animal welfare advocate" and has volunteered with various organizations to further that goal, including the American Society for the Prevention of Cruelty to Animals. She even created her own nonprofit with the aim of improving regional animal shelters.

While the complaint details Hansen's extensive past activities related to animal rights, her prior experience or personal views do not alter the nature of the activity that occurred at the Shelter that day. Shelter volunteers are not employees of the Department or part of any structured association; they are volunteers at the same government agency. The Plaintiff has not alleged any relationship between the individual volunteers nor that they take positions on "public questions." *See City of Dallas v. Stanglin*, 490 U.S. 19, 24-25, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989) (citing *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 548, 107 S. Ct. 1940, 95 L. Ed. 2d 474 (1987)). While it is possible that volunteers at a local animal shelter would have uniform views on "public questions" involving animal welfare, there is nothing in the complaint that alleges that *these volunteers* had such organized positions.

The Plaintiff argues that she intended to become a volunteer to further her animal welfare advocacy. However, this contention was not made in her complaint, which only stated that she "went to the Shelter with the intention of participating in the volunteer orientation so that she could become a volunteer." Compl. ¶ 82. Contrary to the depiction of her motivations in the Plaintiff's opposition brief, there is nothing in the complaint that permits the Court to conclude that her desire to volunteer was connected to her viewpoints on animal rights or welfare. However, even if she added her reasons for volunteering to the complaint, the Plaintiff's individual motivations are irrelevant. "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Stanglin*, 490 U.S. at 25.

Hansen has not pled that the volunteers took a collective position on animal welfare. There is nothing inherent in the activities performed by volunteers such as, walking dogs or fostering animals, that advances animal rights. Just as volunteers at a local nursing home likely have differing opinions on suitable eldercare or the propriety of Social Security, Medicare or the Americans with Disabilities Act, it is entirely conceivable that volunteers at local animal shelters have diverse opinions on animal rights or welfare. The Court will not dissect the assignments given to the Shelter's volunteers to "find some kernel of expression."

The facts at-issue are somewhat analogous to *Stanglin*, where the Supreme Court ruled that the ability of dance-hall patrons to engage in recreational dancing in a local roller-skating rink did not qualify as "expressive association." In *Stanglin*, the Court noted that the dancers, like shelter volunteers, are not part of any organized association and the majority are strangers to one another. Neither group "take[s] positions on public questions," *Stanglin*, 490 U.S. at 25 (quoting *Rotary*

16

*Club*, 481 U. S. at 548). Both involve a diverse group of people who attend their respective events for a common activity. While Hansen attended the training for an activity that is ostensibly more than just a social activity, the Court finds no practical difference under the current framework.

The Plaintiff argues that volunteering at an animal shelter is more akin to attending a local school sporting event, as was at issue in *Johnson*. There, the Second Circuit determined that fans attending school basketball games were engaging in a form of "expressive association." Judge Kearse noted that "persons attending the [basketball] game are expected to engage in expressive activity, chanting and cheering for whichever team they favor. Indeed, they are encouraged to do so; many schools even have at the games groups of students whose function is to lead the audience in boisterous expressions of encouragement and partisanship." *Johnson*, 859 F.3d at 175. While the spectators in *Johnson* were encouraged to express their uniform viewpoint, which was demonstrated by cheering for a particular sports team, the volunteers here did not necessarily have a uniform viewpoint. The activity itself, walking dogs or fostering animals, was not a manifestation of a united belief or opinion. Accordingly, the activities in *Johnson* are distinguishable.

The Court recognizes that there are categories of volunteers in our society that may partake in a form of "expressive association." Volunteers for various levels of campaigns or advocacy groups are engaged in a form of expression. These groups "take positions on public questions," *Stanglin*, 490 U.S. at 25 (quoting *Rotary Club*, 481 U. S. at 548), and it is likely that their volunteers would be understood to convey those messages when performing their work. This is not the case for Hansen or her fellow volunteers. The Court does not believe that the Constitution recognizes volunteer work at a local animal shelter as an "expressive activity" that merits First Amendment protection.

Finally, even if the activity constitutes an "expressive activity," precluding a suspended employee from volunteering for her own Agency is both reasonable and viewpoint neutral. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009) (in a limited public forum, "a government entity may impose restrictions on speech that are reasonable and viewpoint neutral"). Hansen fails to plausibly allege that her removal from the Shelter was neither reasonable nor viewpoint neutral. There is nothing in the complaint that indicates that the Defendants' actions advocate a particular opinion or viewpoint or suppress any group's ideas. *See Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) ("The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the [government] in reserving it for certain groups or for the discussion of certain topics."). Preventing suspended employees from interacting with the agency they were charged with overseeing is a reasonable restriction to the use of the forum. *See Christian Legal Soc'y v. Martinez*, 561 U.S.661, 692-93 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010) (internal citations omitted).

Accordingly, the Plaintiff's First Amendment claim is dismissed.

## D. ABUSE OF PROCESS CLAIM

The Plaintiff contends that the Defendants initiated her arrest to harm her personally and professionally. However, Hansen's failure to plead any potential collateral objectives compels this Court to dismiss her claim on the pleadings alone.

To assert a malicious abuse of process claim, a plaintiff must allege that the defendant "(1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d

Cir. 2003) (internal citations and quotation marks omitted); *Dickerson v. Monroe Cty. Sheriff's Dep't*, 114 F. Supp. 2d 187, 192 (W.D.N.Y. 2000) ("In the criminal context, malicious abuse of process is by definition a denial of procedural due process." (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994))). These elements must be pled regardless of whether the claim is under New York State law or Section 1983. *Anderson v. Cty. of Nassau*, 297 F. Supp. 2d 540, 548 (E.D.N.Y. 2004) (Spatt, J.). If the claim is stated under § 1983, as it is in the instant case, a plaintiff must establish the above state law elements as well as the deprivation of a constitutional right. *See Cook*, 41 F.3d at 79-80.

The second prong requires that the Plaintiff allege that the Defendants acted "with intent to do harm without excuse [or] justification." *Savino*, 331 F.3d at 76. The Plaintiff contends that intent can be inferred from the actions of Dehoyos, Sylvester, Valentine, Lee, Inzerillo and DeSanti: (1) Dehoyos, Sylvester, Valentine and Lee purportedly made false statements to the police; (2) Inzerillo attempted to have Hansen photographed by a reporter during her arrest; (3) the timeline of events; and (4) DeSanti's comments during her termination. However, with the Court's below finding that Hansen failed to allege that the Defendants had the Plaintiff arrested in order to achieve a collateral objective, the Court declines to address this element of malicious abuse of process.

The third prong requires Hansen to assert that the Defendants used the process, in this case her arrest, "in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (quoting *Cook*, 41 F.3d at 80). District courts distinguish between a collateral objective and an improper purpose with a malicious motive. *See, e.g.*, *Roeder v. Rogers*, 206 F. Supp. 2d 406, 414 (W.D.N.Y. 2002). "[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against [her] by pursuing [her] arrest and prosecution.

19

Instead, [she] must claim that they aimed to achieve a collateral purpose beyond or in addition to [her] criminal prosecution." *Savino*, 331 F.3d at 77. However, here, the Plaintiff merely states that she was arrested "not for any legitimate concerns to seek justice, but rather for collateral and malicious purposes." Compl. ¶ 121. The complaint does not state what the collateral purposes may have been in addition to Hansen's criminal prosecution. This threadbare accusation does not allow the Court to evaluate an alternative motive to assist in the Plaintiff's arrest. *Iqbal* precludes Hansen from relying on conclusory pleadings that merely recite the elements of a cause of action. *Iqbal*, 556 U.S. at 664.

The Plaintiff contends in her opposition brief that, "it can be inferred that Defendants acted with the unlawful collateral objective of using Hansen's arrest as a tool to remove Hansen from her position." This conclusory argument is simply too vague be considered. The Plaintiff's failure to include this collateral objective in her complaint is dispositive in this motion to dismiss. Construing the allegations in the light most favorable to the Plaintiff, she fails to allege any potential collateral objective in the complaint beyond pursuing Hansen's criminal prosecution. *See Duamutef v. Morris*, 956 F. Supp. 1112, 1119 (S.D.N.Y. 1997) (dismissing plaintiff's claim for "failing to provide this Court with any basis for assessing his claim that defendants … prosecuted him in an effort to stifle any particular protected activity").

Accordingly, the Plaintiff's § 1983 and New York State claims for malicious abuse of process are dismissed.

### E. MALICIOUS PROSECUTION CLAIM

The Plaintiff argues that DeSanti, Dehoyos, Sylvester, Valentine, Lee and Inzerillo caused the initiation of a criminal prosecution without the requisite probable cause. The Defendants

contend that (1) they are entitled to qualified immunity; and (2) regardless of their purported immunity, the Plaintiff pursues the wrong individuals.

To assert a malicious prosecution claim under New York law, "a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal citations and quotation marks omitted); *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (same); *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 604 (E.D.N.Y. 2017) (same). In a Section 1983 claim, a plaintiff must also demonstrate that there was "(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000). "The existence of probable cause will defeat a claim of malicious prosecution and unreasonable search and seizure." *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).

### 1. Commencement or Continuation of a Criminal Proceeding

The Defendants' later contention, that Hansen pursues the wrong individuals for malicious prosecution, implicates the first element of the claim. "While malicious prosecution claims are generally brought against arresting or prosecuting officials, 'they can also be brought against individuals other than the arresting officer when such a person actively engaged in a plaintiff's prosecution.'" *Bornschein v. Herman*, 304 F. Supp. 3d 296, 302 (N.D.N.Y. 2018) (quoting *TADCO Constr. Corp. v. Dormitory Auth. of the State of New York*, 700 F. Supp. 2d 253, 270 (E.D.N.Y. 2010)).

Therefore, to allege the initiation or continuation of a criminal proceeding with regard to a defendant who is not an arresting or prosecuting official, a plaintiff may show "that [the] defendant

played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 199 (2d Cir. 2014) (quoting *Rohman*, 215 F.3d at 217); *Mitchell v. Victoria Home*, 434 F. Supp. 2d 219, 227 (S.D.N.Y. 2006) (same). "The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition." *Lupski v. Cty. of Nassau*, 32 A.D.3d 997, 998, 822 N.Y.S.2d 112, 114 (2d Dep't 2006). An individual that files a police report that is relied on by the prosecutor satisfies this standard. *See, e.g.*, *Mejia v. City of New York*, 119 F. Supp. 2d 232, 272 (E.D.N.Y. 2000) ("A witness … who files a charging affidavit is clearly a complaining witness, but other witnesses may be considered complaining witness[es] as well if the information they falsely gave the prosecutor induced the prosecutor to act."); *Brown v. Sears Roebuck and Co.*, 297 A.D.2d 205, 209, 746 N.Y.S.2d 141, 146 (1st Dep't 2002) ("[A] defendant may be said to have initiated a criminal proceeding by providing false evidence to the police" which they later relied on in making an arrest.).

Hansen maintains that DeSanti, Dehoyos, Sylvester, Lee and Valentine prepared or gave police statements based upon false statements. This claim is supported by sufficient factual pleadings to satisfy the plausibility standard. *See, e.g.*, *Manganiello*, 612 F.3d at 163 ("A jury may permissibly find that a defendant initiated a prosecution where he prepared an alleged false confession.") (internal citations and quotation marks omitted).

However, the Plaintiff's factual contentions regarding Inzerillo are insufficient to satisfy the first element of a malicious prosecution claim. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (*quoting Farrell v.*

22

*Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *accord Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir. 1994) (dismissing defendants that had nothing to do with the deciding whether to prosecute the plaintiff). Hansen alleges that Inzerillo instructed DeSanti to find a volunteer to call a Newsday photographer to encourage Newsday to take photographs of Hansen during her arrest. Based on this, Inzerillo likely knew that Hansen was about to be arrested. It is not clear how she knew or if she did anything else with that information. However, this factual allegation alone does not amount to a malicious prosecution claim. Inzerillo's knowledge of the arrest does not claim sufficient involvement to "play[] an active role in the prosecution." *Stampf*, 761 F.3d at 199 (quoting *Rohman*, 215 F.3d at 217). Her apparent attempt to embarrass or humiliate the Plaintiff did not influence the actuality or manner of Hansen's arrest. Hansen fails to allege that Inzerillo's participation rose to a level to engender liability for malicious prosecution.

The Plaintiff's malicious prosecution claim against Inzerillo is dismissed.

**2. Qualified Immunity**

The Defendants also argue that DeSanti, Dehoyos, Sylvester, Valentine, Lee and Inzerillo are entitled to qualified immunity. As Hansen's claim against Inzerillo is already dismissed, the Court will focus on allegations against DeSanti, Dehoyos, Sylvester, Valentin and Lee.

"The qualified immunity defense is intended to strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority. The qualified immunity doctrine protects government officials from civil liability in the performance of discretionary functions as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Lee v. Sandberg*, 136 F.3d 94, 100-01 (2d Cir. 1997) (internal citations and quotation

marks omitted); *accord Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995) (noting that under qualified immunity, "a government official may claim immunity from suit only when in light of clearly established law and the information the official possesses, it was objectively reasonable for him to think that his actions were lawful"); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 95 (S.D.N.Y. 2016) ("The doctrine of qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments' by immunizing them from suit for damages unless their conduct violated clearly established constitutional rights of which a reasonable person would have known." (quoting *Stanton v. Sims*, 571 U.S. 3, 134 S. Ct. 3, 5, 187 L. Ed. 2d 341 (2013))).

It provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986). Whether or not the Individual Defendants are entitled to qualified immunity is a question of law. *See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (noting that qualified immunity should be decided "at the earliest possible stage in the litigation"); *Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995) ("Since qualified immunity is intended to protect government officials from the harassing and expensive burdens of litigation as well as the threat of monetary damages, courts have encouraged the use of summary judgment as a procedural device to dispose early in the litigation process of those claims barred by qualified immunity.").

The Supreme Court has explained that "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, —— U.S. – ——, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.

Ct. 2074, 179 L. Ed. 2d 1149 (2011) (same); *see also Simms v. Vill. of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997) (holding that qualified immunity protects public officials "from civil damages liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it is objectively reasonable for them to believe that their acts do not violate those rights" (internal citations and quotation marks omitted)). A principle is clearly established if it has a "sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. In other words, it must be "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id*. at 589-90 (internal citations and quotation marks omitted).

The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id*. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 2023,188 L. Ed. 2d 1056 (2014)). Therefore, the Court must examine whether the probable cause determination at the time of the arrest and subsequent prosecution was objectively reasonable. *See White v. Pauly*, ⸻ U.S. ⸻, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017); *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000); *Serrano v. City of New York*, No. 16 Civ. 8105 (AKH), 2018 WL 3392869, at *6 (S.D.N.Y. July 12, 2018) (noting that "the focus of the [qualified immunity] inquiry ... centers on the facts and circumstances known to the officers at the time of the arrest").

For the above-mentioned Individual Defendants' conduct to be unlawful, it must have been clearly established by either a Supreme Court or a Second Circuit Court of Appeals case directly on point, or there must be agreement from other federal courts. *See Moore v. Vega*, 371 F.3d 110, 115 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the

alleged violation is relevant in deciding whether a right is clearly established." (citing *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999))).

The Court must consider whether it was a clearly established in March 2017 that a criminal prosecution based only on purportedly false statements was based on a lack of probable cause. According to Hansen, the Plaintiff's warrantless arrest was based exclusively on the false statements provided by the above-mentioned Individual Defendants. The Plaintiff cites *Mejia* in support of her position that it was clearly established that the Defendants' actions were unconstitutional. There, the district court examined a Second Circuit case, *White v. Frank*, 855 F.2d 956 (2d Cir. 1988). In *White*, the Second Circuit held that qualified immunity does not attach to "defendants who manufacture evidence." *Mejia*, 119 F. Supp. 2d at 273-74 (internal citations omitted). This is because "none of the specific policy concerns [for qualified immunity]— preserving the government's ability to perform its traditional functions (here, prosecuting wrongdoers); encouraging qualified candidates to enter public service; and discouraging unwarranted timidity on the part of public officials in the performance of their duties by removing the threat of liability for reasonable errors of judgment—support extending qualified immunity," *Id*. at 274, to government employees who are alleged to have provided false statements that induced a prosecution. In other words, it was clearly established at the time of the Plaintiff's prosecution that her arrest, which was based on purportedly false statements, lacked probable cause. Hansen's allegation that DeSanti, Dehoyos, Sylvester, Lee, Valentine and Inzerillo provided false statements to the police which directly led to her arrest and prosecution prohibit any finding of qualified immunity.

Accordingly, DeSanti, Dehoyos, Sylvester, Valentine and Lee are not entitled to qualified immunity for malicious prosecution under Section 1983.

The Plaintiff's malicious prosecution claim as it pertains to Inzerillo is dismissed.

## III. CONCLUSION

For the reasons stated above, the Defendants' motion to dismiss the Plaintiff's complaint pursuant to Rule 12(b)(6), is granted in part. The Plaintiff's first, second and fourth claims are dismissed in their entirety and her third claim is dismissed as it pertains to the Town and Inzerillo. The Clerk of the Court is respectfully directed to terminate the Town, Garcia, McPadden and Inzerillo from this action. The caption is accordingly amended as follows:

```
---------------------------------------------------------X
 SUSAN HANSEN,

                        Plaintiff,

               -against-

 MICHELE DESANTI, CHRISTINA DEHOYOS,
 KAREN SYLVESTER, JOHN VALENTINE,
 and JAMES LEE, in their official and individual
 capacities,
                        Defendants.
---------------------------------------------------------X
```

It is **SO ORDERED**:

Dated: Central Islip, New York

October 24, 2018

___/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge