UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
SUSAN HANSEN,

                         Plaintiff,                 <u>MEMORANDUM & ORDER</u>
                                                  18-CV-2438 (JS)(AYS)

     -against-

MICHELE DESANTI; CHRISTINA
DEHOYOS; KAREN SYLVESTER;
JOHN VALENTINE; and JAMES LEE,
in their official and individual
capacities,

                       Defendants.
--------------------------------X
APPEARANCES
For Plaintiff:        Matthew Brian Weinick, Esq.
                      Famighetti & Weinick, PLLC
                      25 Melville Park Road, Suite 235
                      Melville, New York  11747

For Defendants:      Meghan McGuire Dolan, Esq.
                      Scott D. Middleton, Esq.
                      Richard Anthony DeMaio, Esq.
                      Campolo, Middleton & McCormick, LLP
                      4175 Veterans Memorial Highway, Suite 400
                      Ronkonkoma, New York  11779

SEYBERT, District Judge:

       Susan Hansen ("Plaintiff") commenced this action against

Defendants Michele DeSanti ("DeSanti"), Christina DeHoyos

("DeHoyos"), Karen Sylvester ("Sylvester"), John Valentine

("Valentine"), and James Lee ("Lee") (collectively, "Defendants")

and asserts a claim pursuant to 42 U.S.C. § 1983 ("Section 1983")

for malicious prosecution.  Plaintiff, the Director of the Town of

Smithtown Animal Shelter, was formally suspended from her position

and during the course of her suspension, entered the Shelter and

was arrested for trespassing -- the criminal charges for which were later dismissed, giving rise to this action. (<u>See generally</u> Compl.) Pending before the Court is Defendants' motion for summary judgment against Plaintiff's malicious prosecution claim, which Plaintiff opposes. (<u>See</u> Defs. Mot., ECF No. 42; Support Memo, ECF No. 43; Opp'n, ECF No. 44; Reply, ECF No. 47.) For the following reasons, Defendants' motion is GRANTED.

FACTUAL BACKGROUND[1]

I.   <u>Plaintiff's Suspension</u>

This action arises from Plaintiff's arrest for trespassing at the Town of Smithtown (the "Town") Animal Shelter (the "Shelter") following her suspension as Director of the Shelter. (<u>See</u> Defs. 56.1 Stmt. ¶¶ 3, 10.) During the relevant time period, Defendants were Town employees and served as witnesses in connection with Plaintiff's arrest. (<u>Id.</u> ¶ 6.)

Unfortunately, the parties' respective 56.1 Statements shed no light as to the events giving rise to Plaintiff's suspension. Notwithstanding, Defendants contend that Plaintiff

---

[1] The facts are drawn from Defendants' Local Rule 56.1 Statement and Plaintiff's Local Rule 56.1 Counterstatement. (<u>See</u> Defs. 56.1 Stmt., ECF No. 42-18; Pl. 56.1 Counterstmt., ECF No. 42-19.) The Court notes any relevant factual disputes. Unless otherwise stated, a standalone citation to a Local Rule 56.1 Statement or Counterstatement denotes that either the parties agree or the Court has determined that the underlying factual allegation is undisputed. Citation to a party's Local Rule 56.1 Statement or Counterstatement incorporates by reference the document cited therein.

was suspended from her position because the Town advised her on multiple occasions that she was mismanaging and ineffectively running the Shelter; however, Plaintiff never rectified her performance. (See Support Memo at 2.) Thus, on February 7, 2017, the Office of the Town Attorney served Plaintiff with a letter, in accordance with Section 75 of the New York Civil Service Law, that formally suspended her and set forth the specific charges (the "Suspension Letter"). (See Suspension Ltr., ECF No. 42-9.) These charges asserted, inter alia, that Plaintiff (1) failed to contact the Department of Public Safety regarding inoperative fire alarms at the Shelter, (2) terminated the employment of a Shelter employee without obtaining approval of the Town Board, (3) failed to provide adequate instruction to employees for "dealing with the public," and (4) placed an employee at risk by taking them to the home of an individual who adopted a dog from the Shelter while having reason to believe that the employee was entering a potentially volatile and dangerous situation. (See id. at 1.) Plaintiff, on the other hand, insinuates that she was suspended in an act of retaliation by Town Councilwoman Lisa Inzerillo that was related to Plaintiff's attempt to unilaterally fire an employee. (See Opp'n at 3.)

The Suspension Letter was hand delivered to Plaintiff by three investigators from the Town's Public Safety Department,

Defendants Lee and Sylvester, and non-party James Garcia.[2]   (See Defs. 56.1 Stmt. ¶ 11.)   After Plaintiff read the Letter, these officers collected Plaintiff's keys and ID, and escorted her off of Town property.   (Id. ¶ 12.)   In addition to notifying Plaintiff of the charges levied against her, the Suspension Letter also advised Plaintiff that she is entitled to a hearing and the procedures related thereto, the potential penalty imposed upon her should she be found guilty, and that she was suspended with pay for thirty days, effective February 7, 2017, pending the determination of the charges.   (See Suspension Letter at 1-2.) Although the Suspension Letter does not state whether Plaintiff was still permitted to return to the Shelter (or Town property) during her period of suspension (see id.), Defendants Lee and Sylvester stated that when they gave Plaintiff the Letter, Lee told Plaintiff she was unable to do so for thirty days (see Defs. 56.1 Stmt. ¶ 14).   Plaintiff disputes that Lee informed Plaintiff of this fact.   (Pl. 56.1 Counterstmt. ¶ 14.)

Defendant Valentine, Director of Public Safety, stated there is no "set of rules or specific things that have to be said" when advising an employee of their suspension nor is there an official Town policy concerning the delivery of suspension letters.   (See Defs. 56.1 Stmt. ¶ 13; Valentine Depo. Tr. at 14-15,

---

[2] Garcia was initially a named defendant but has since been dismissed from this case.

ECF No. 42-7.)  There is, however, a "standard routine with the [Public Safety] officers," which includes advising the suspended employee that they cannot return to the Town property where they worked.  (See Valentine Depo. Tr. at 15-17.)

II.  <u>Plaintiff's Return to the Shelter and the</u>
     <u>Contemporaneous Investigation into the Shelter</u>

       While Plaintiff was still suspended, on February 18, 2018, she went to the Shelter to attend an orientation class that is provided to members of the public who want to volunteer at the Shelter.  (Defs. 56.1 Stmt. ¶ 15; Pl. 56.1 Counterstmt. ¶ 15; Opp'n at 5-6.)  Garcia, who was at the Shelter that day and saw Plaintiff, questioned her ability to be at the Shelter and called one of his supervisors, Deputy Chief Kevin McPadden, to apprise him of the situation.  (See Investigative Report, ECF No. 42-10.)  Afterwards, Garcia advised Plaintiff that she was not authorized to be at the Shelter and escorted her off of the premises.  (Defs. 56.1 Stmt. ¶ 16.)  Defendant Valentine was at the Shelter that day as well and did not call the police to report Plaintiff's presence.  (See Valentine Depo. Tr. at 41.)  He did notify Town Supervisor Vecchio and advised that he would also notify the District Attorney's Office because "at that time, there was a bigger investigation [into the Shelter] going on" (id. at 42) -- an investigation of which Plaintiff was also aware (Hansen Depo. Tr. at 71-76, ECF No. 42-5).  Valentine also directed Garcia to complete an

Investigative Report to document what had transpired with Plaintiff. (See Valentine Depo. Tr. at 39-40.) In the Investigative Report, Garcia noted that Plaintiff complied with his directive to leave. (See Investigative Report.)

Regarding the contemporaneous investigation into the Shelter, it was Valentine's understanding that the Suffolk County District Attorney's ("D.A.") Office received "a tremendous amount of allegations . . . about the [S]helter not being operated properly" and that the D.A. was not "looking at a particular person" but "everybody," which "was very clear." (Valentine Depo. Tr. at 43-45.) Although part of this investigation focused on some alleged conduct by Plaintiff (see Beyrer Aff. ¶ 3, ECF No. 45-12), Plaintiff believed that only a former supervisor was under investigation due to an incident involving the euthanasia of approximately 20 animals in one day (Hansen Depo. Tr. at 71-72). Despite the fact that Plaintiff's employment with this supervisor apparently never overlapped (Hansen Depo. Tr. at 70-71), Plaintiff retained an attorney as a result of this investigation and advised the detectives handling the matter that she would only speak to them with her attorney present (see Defs. 56.1 Stmt. ¶ 20).

Valentine stated that members of the D.A.'s Office were "routinely in [his] office[] working on this case." (Valentine Depo. Tr. at 44.) In particular, they were completing paperwork, speaking with Town employees, and executing a subpoena with Town

investigators.   (Id.)   As such, on February 20, 2017, Valentine advised Detectives Alex Beyrer and Nancy Paul of Plaintiff's presence at the Shelter two days prior.   (Id. at 48-49.)   He reported this information to the Detectives as a matter of transparency because "there [was] an ongoing investigation by a higher authority" and "in [his] own feelings and professionalism, it would be inappropriate not to advise the District Attorney's Office that something . . . occurred." (Id. at 47-48.)   This topic was "part of a larger conversation" they had, but Valentine stated that at no point did he suggest that Plaintiff should be arrested. (Id. at 49-50.)   Valentine could not recall whether he said Plaintiff "trespassed" but made clear that Plaintiff was not supposed to be at the Shelter.   (Id. at 50.)   The Detectives then advised Valentine that they would confer with the Assistant D.A. handling the case but did not follow up with Valentine afterwards. (Id. at 50-51.)   However, law enforcement then began to collect statements from Town personnel.   (Id. at 51.)   Valentine said he did not play a role in the investigation regarding Plaintiff, i.e., he did not tell the Detectives whom they should take statements from.   (Id. at 51-52.)   Contrary to Valentine's testimony, Detective Beyrer stated that, during their conversation, Valentine "did communicate to [her] that the Town wanted to have Ms. Hansen charged with trespass" and that she "arranged with Mr. Valentine

to take written statements of the several witnesses to the event."
(Beyrer Aff. ¶ 6.)

III. <u>Plaintiff's Arrest</u>

Thereafter, Detective Beyrer obtained from Lee and Sylvester sworn statements describing what transpired as they served Plaintiff with the Suspension Letter and noting that Plaintiff was advised she cannot return to the Shelter for thirty days -- a fact Plaintiff vigorously disputes. (<u>See</u> Pl. 56.1 Counterstmt. ¶ 28; Lee Stmt., ECF No. 42-11; Sylvester Stmt., ECF No. 42-12.) Detective Beyrer then took sworn written statements from DeHoyos and DeSanti, both of whom were Shelter employees (Beyrer Aff. ¶¶ 7-8) and witnessed Plaintiff at the Shelter on February 18, 2017 (<u>see</u> DeHoyos Stmt., ECF No. 42-13; DeSanti Stmt., ECF No. 42-14). Both DeHoyos and DeSanti expressed that they were surprised to see Plaintiff that day because of her suspension. (<u>See</u> DeHoyos Stmt.; DeSanti Stmt.) After she obtained these statements, Detective Beyrer forwarded her file to the Suffolk County Police Department's Fourth Precinct Crime Section. Detective Beyrer then spoke to Police Officer Jeffrey Harkins, who was assigned to the Crime Section, to "advise[] him of the trespass allegation and that the Town was seeking to have Ms. Hansen charged." (Beyrer Aff. ¶ 10.)

Then, on March 10, 2017, Valentine provided Officer Harkins with a sworn "Criminal Trespass Affidavit," an affidavit

that Valentine routinely provides law enforcement for individuals trespassing on Town properties, which indicates that Plaintiff did not have permission to enter or remain on the property of the Shelter on February 18, 2017.   (See id. ¶ 11; Criminal Trespass Aff., ECF No. 42-15; Defs. 56.1 Stmt. ¶ 37.)   According to Detective Beyrer, that same day, "it was determined that probable cause existed to charge Ms. Hansen" with the offense of criminal trespass in the third degree pursuant to New York State Penal Law § 140.10A, which provides that "[a] person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property." (See Beyrer Aff. ¶¶ 12-13.)   The probable cause determination was based upon "the sworn written statements establishing that Ms. Hansen was advised on February 7, 2017 that she was suspended from her job and was not permitted to return to the Shelter for 30 days, that she in fact returned to the shelter on February 18, 2017, and that she was not given permission to remain or enter on that property." (Id. ¶ 12.)   Consequently, Plaintiff was arrested; however, the D.A. ultimately dismissed the charge. (Pl. 56.1 Counterstmt. ¶ 7.)

## PROCEDURAL HISTORY

Plaintiff initiated this action on April 25, 2018 against the Town, DeSanti, DeHoyos, Sylvester, Valentine, Lee, Garcia, McPadden, and Inzerillo. (See Compl.) Plaintiff asserted claims pursuant to Section 1983 for violations of her First

Amendment right for freedom of assembly as well as her Fourth Amendment rights for abuse of process and malicious prosecution. (See id. ¶¶ 119-24.)  Plaintiff also raised a claim for abuse of process pursuant to New York State law.  (Id. ¶ 125.)  Defendants then moved to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  On October 24, 2018, the Honorable Judge Arthur D. Spatt granted Defendants' motion in part.  (See Mem. of Decision & Order, ECF No. 20.)  The Town, Garcia, McPadden, and Inzerillo were dismissed from this case and Plaintiff's sole surviving claim was for malicious prosecution.  (Id. at 27.)  This case was reassigned to the undersigned on June 30, 2020.  With the Court's leave, Defendants filed the instant summary judgment motion on September 17, 2020.

ANALYSIS

I.   Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154, 164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)) (internal quotation marks omitted).

The movant bears the burden of establishing that there are no genuine issues of material fact in dispute. CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id.

In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)). The Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

II. Discussion

As set forth above, the sole remaining claim in this case is for malicious prosecution against Defendants DeSanti, DeHoyos, Sylvester, Valentine, and Lee.

A.   <u>Applicable Law</u>

1.   <u>Section 1983</u>

Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the laws of the United States.  <u>See</u> 42 U.S.C. § 1983; <u>Cornejo v. Bell</u>, 592 F.3d 121, 127 (2d Cir. 2010).  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  <u>Wyatt v. Cole</u>, 504 U.S. 158, 161 (1992).

2.   <u>Malicious Prosecution</u>

"In order to prevail on a Section 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment . . . and must establish the elements of a malicious prosecution claim under state law." <u>Manganiello v. City of New York</u>, 612 F.3d 149, 160–61 (2d Cir. 2010) (internal citations omitted).  Under New York law, a claim for malicious prosecution requires: "(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  <u>Id.</u> at 161 (quoting <u>Murphy v. Lynn</u>, 118 F.3d 938, 947 (2d Cir. 1997)); <u>see</u>

also Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003).
In addition, under Section 1983, the plaintiff must further
demonstrate "a post-arraignment deprivation of liberty that rises
to the level of a constitutional violation." Bailey v. City of
New York, 79 F. Supp. 3d 424, 448 (E.D.N.Y. 2015) (citing Boley v.
Durets, No. 12-CV-4090, 2013 WL 6562445, at *5 (E.D.N.Y. Dec. 10,
2013)).

      "[T]he existence of probable cause is a complete defense
to a claim of malicious prosecution in New York." Savino, 331
F.3d at 72; see also McClellan v. Smith, 439 F.3d 137, 145 (2d
Cir. 2006) ("The absence of probable cause is an essential element
to a claim for malicious prosecution.")  This is the case because
"a malicious prosecution claim is rooted in the Fourth Amendment
right to be free from a baseless criminal prosecution." Hoyos v.
City of New York, 999 F. Supp. 2d 375, 390 (E.D.N.Y. 2013) (citing
Morse v. Spitzer, No. 07-CV-4793, 2012 WL 3202963, at *2 (E.D.N.Y.
Aug. 3, 2012) (interpreting Albright v. Oliver, 510 U.S. 266, 271
(1994), and Singer v. Fulton County Sheriff, 63 F.3d 110, 116 (2d
Cir. 1995))).  But importantly, the relevant probable cause
determination depends on the stage of the criminal proceeding.

      "Probable cause, in the context of malicious
prosecution, has . . . been described as such facts and
circumstances as would lead a reasonably prudent person to believe
the plaintiff guilty." Stansbury, 721 F.3d at 95 (quoting Boyd v.

13

City of New York, 336 F.3d 72, 76 (2d Cir. 2003)); Hoyos, 999 F.
Supp. 2d at 390 ("[T]he relevant probable cause determination is
whether there was probable cause to believe the criminal proceeding
could succeed and, hence, should be commenced.").  As a result,
probable cause in the context of malicious prosecution is measured
"as of the time the judicial proceeding is commenced (e.g., the
time of the arraignment)," not the time of the arrest.  Hoyos, 999
F. Supp. 2d at 390 (quoting Davis v. City of New York, 373 F. Supp.
2d 322, 333 (S.D.N.Y. 2005)); id. ("Information obtained 'after
the arrest, but before the commencement of proceedings, is relevant
to the determination of probable cause' for a malicious prosecution
claim."); Stone v. Port Auth. of New York & New Jersey, No. 11-
CV-3932, 2014 WL 3110002, at *9 (E.D.N.Y. July 8, 2014) ("[E]ven
when probable cause is present at the time of arrest, evidence
could later surface which would eliminate that probable
cause. . . ."); Jean v. County of Nassau, No. 14-CV-1322, 2020 WL
1244786, at *9 (E.D.N.Y. Mar. 16, 2020) (citing McDermott v. City
of New York, No. 94-CV-2145, 1995 WL 347041, at *5 (E.D.N.Y. May
30, 1995)) ("In the absence of some indication that the authorities
became aware of exculpatory evidence between the time of the arrest
and the subsequent prosecution that would undermine the probable
cause which supported the arrest, no claim for malicious
prosecution may lie.").

3.   Qualified Immunity

Qualified immunity shields government officials from civil liability resulting from the performance of their discretionary functions only where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Wallace v. Suffolk County Police Dep't, 396 F. Supp. 2d 251, 265 (E.D.N.Y. 2005) (Seybert, J.) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To determine whether qualified immunity applies, courts consider "whether the facts shown make out a violation of a constitutional right and whether the right at issue was clearly established at the time of the defendant's alleged misconduct."  Tankleff v. County of Suffolk, No. 09-CV-1207, 2017 WL 2729084, at *17 (E.D.N.Y. June 23, 2017) (quoting Estate of Devine v. Fusaro, 676 F. App'x 61, at *1 (2d Cir. 2017) (cleaned up)).  Whether a right was clearly established should be analyzed from the perspective of a reasonable official, and the relevant inquiry is whether "it would be clear to a reasonable office[ial] that his conduct was unlawful in the situation he confronted."  Id.

B.   Application

In their motion, Defendants contend that summary judgment must be granted for two reasons: (1) Plaintiff cannot satisfy the initiation, probable cause, and malice elements for a

malicious prosecution claim; and (2) Defendants enjoy qualified immunity.  The Court will address each of these arguments in turn.

### 1.   Initiation of a Criminal Proceeding

As to the "initiation" element, "although malicious prosecution claims are usually made against arresting or prosecuting officials, they can also be brought against individuals other than the arresting officer when such a person actively engaged in a plaintiff's prosecution." TADCO Constr. Corp. v. Dormitory Auth. of State of N.Y., 700 F. Supp. 2d 253, 270 (E.D.N.Y. 2010) (citing Shattuck v. Town of Stratford, 233 F. Supp. 2d 301, 313-14 (D. Conn. 2002)).  "A person who tells law enforcement authorities that he or she thinks that a crime has been committed and does no more, does not thereby put him- or herself at risk of liability for malicious prosecution should the arrest or prosecution later be abandoned or result in an acquittal." Rohman v. New York City Transit Auth. (NYCTA), 215 F.3d 208, 217 (2d Cir. 2000).  Rather, in order for an individual to initiate a prosecution for these purposes, "it must be shown that [a] defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Id. (quoting DeFilippo v. County of Nassau, 183 A.D.2d 695, 696 (N.Y. App. Div. 2d Dep't 1992)).  However, providing information "that is known to be false qualifies as the commencement of a prosecution." Rivers v. Towers, Perrin, Forster

& Crosby Inc., 07-CV-5441, 2009 WL 817852, at *3 (E.D.N.Y. Mar. 27, 2009) (citing Lupski v. County of Nassau, 822 N.Y.S.2d 112, 114 (N.Y. App. Div. 2d Dep't 2006)).

As such, to satisfy the "initiation" element, a plaintiff may proceed along one of two routes, demonstrating (1) that a defendant urged for a plaintiff to be prosecuted; or (2) that a defendant provided knowingly false information to law enforcement. Defendants here contend they did not initiate a criminal proceeding against Plaintiff, because they merely reported information to law enforcement and did not provide any knowingly false statements to ensure Plaintiff was arrested. Plaintiff disagrees, arguing that Valentine urged Detective Beyrer to have Plaintiff arrested and that every Defendant provided false information to law enforcement, i.e., that Plaintiff was advised she could not be at the Shelter during her suspension. (See Opp'n at 13-19.)

a.  Valentine's Purported "Urging" of Plaintiff's Prosecution

To begin, there is conflicting evidence in the record as to whether Defendant Valentine even told Detective Beyrer that the Town sought to have Plaintiff charged with or arrested for trespassing; however, the Court does not find this issue of fact material for purposes of resolving the instant motion. Even if the Court accepts such information as true and finds that Valentine

17

told Detective Beyrer that the Town sought to have Plaintiff charged, there is nothing in the record to indicate that Valentine's conversation with Beyrer crossed the line from the mere reporting of a crime to influencing Plaintiff's prosecution.

According to Detective Beyrer, an unidentified Town employee contacted her to advise that Plaintiff entered the Shelter despite being suspended and not permitted to do so.  (See Beyrer Aff. ¶ 4.)  Then, "[a]round the same time," Detective Beyrer had a telephone conversation with Valentine, during which he also told her of Plaintiff's entrance into the Shelter and indicated "that the Town wanted to have [Plaintiff] charged."  (Id. ¶¶ 5-6.) Despite Plaintiff's argument that Valentine "called Detective Beyrer, urging her to charge Hansen," (see Opp'n at 13), Detective Beyrer does not indicate whether she or Valentine initiated that phone call (see Beyrer Aff. ¶ 5).  In addition, there is nothing in the record to contradict Valentine's testimony in which he stated that his notifying Detective Beyrer of Plaintiff's presence was part of a larger conversation pertaining to the contemporaneous investigation in the Shelter.  As such, Plaintiff has not created an issue of material fact to show that the conversation between Valentine and Beyrer was initiated by Valentine, let alone that the purpose of the conversation was to encourage the Detectives to act and charge Plaintiff.

Moreover, the record is bereft of information showing Valentine urged Detective Beyrer to have Plaintiff charged to the point where Detective Beyrer did not make the decision to proceed with an investigation upon her own volition.   On this point, Plaintiff's efforts to distinguish Barrett v. Watkins are unavailing.   Plaintiff argues that although the defendant in Barrett provided the police with a trespass complaint detailing the circumstances of the alleged crime, the plaintiff's malicious prosecution claim was dismissed because the prosecutor testified that she made the decision to pursue the plaintiff's prosecution on a good faith basis.   (See Opp'n at 12-13 (citing Barrett v. Watkins, 82 A.D.3d 1569, 1572 (N.Y. App. Div. 3d Dep't 2011)).) Plaintiff highlights that the Barrett defendants produced testimony from the prosecutor to disprove a malicious prosecution claim whereas Defendants here have not.   Although Plaintiff is correct that the record here does not contain any statements from the prosecutor who handled her underlying criminal matter similar to the evidence proffered in Barrett, the Court finds Detective Beyrer's affidavit provides comparable information.  Following her conversation with Valentine, Detective Beyrer "arranged with" Valentine to take written statements from witnesses, i.e., Sylvester, Lee, DeHoyos, and DeSanti.  After undertaking her own investigation, Detective Beyrer forwarded her investigative file to the Suffolk County Police Department, at which point Officer

Harkins became involved.   Officer Harkins then obtained the
"Criminal Trespass Affidavit" from Valentine, in which Valentine
stated that he did not give Plaintiff permission to enter the
Shelter.   Then, "based upon the sworn witness statements" which
showed that Plaintiff was advised not to be at the Shelter due to
her suspension and went anyway without receiving permission to do
so, "it was determined that probable cause existed."  Beyrer Aff.
¶ 12.  Officer Harkins' participation in the investigation leads
to the reasonable conclusion that this probable cause
determination was not made solely by Detective Beyrer.  Moreover,
the "Misdemeanor Information" sheet that Officer Harkins filed in
state court indicates that Harkins himself was the "complainant"
and that the trespassing charge against Plaintiff was based upon
his personal knowledge and information from Sylvester, Lee,
DeHoyos, DeSanti, and Garcia.  (Misdemeanor Information, ECF No.
42-17.)   Notably, the Misdemeanor Information does not even
indicate that any information provided by Valentine led to the
charge.

        As such, the Court does not agree with Plaintiff that a
reasonable juror could find Valentine's judgment was possibly
substituted for that of Beyrer's own when deciding to pursue
criminal charges against Plaintiff . See Lupski, 822 N.Y.S.2d at
114 ("The defendant must have affirmatively induced the officer to
act, such as taking an active part in the arrest and procuring it

to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition." (quoting Mesiti v. Wegman, 763 N.Y.S.2d 67 (N.Y. App. Div. 2d Dep't 2003))).

>    b.   Defendants' Alleged Provision of False
>         Information to Law Enforcement

Plaintiff also attempts to establish the "initiation" element by arguing that each Defendant provided false or misleading information to law enforcement.  This, however, misstates the applicable standard, which requires Defendants to have "knowingly" provided law enforcement with false information, or even to have created false information or withheld material information.  See Rivers, 2009 WL 817852, at *3 (providing information "that is known to be false qualifies as the commencement of a prosecution" (citing Lupski, 822 N.Y.S.2d at 114)); see also Ying Li v. City of New York, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017) ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'" (quoting Costello v. Milano, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014))). While Plaintiff identifies purportedly false statements made by

Lee, Sylvester, DeHoyos, DeSanti, and Valentine, none of these is sufficient to overcome summary judgment.[3]

The crux of Plaintiff's argument on this point is that Defendants provided law enforcement with sworn written statements that falsely indicated Plaintiff had been directed not to return to the Shelter following her suspension, because Plaintiff claims she was never told not to return. The record, however, is absent of any indicia that Defendants knew their statements to law enforcement were false. The portions of Lee's and Sylvester's statements at issue provide that, on February 7, 2017, Lee told Plaintiff she could not return to the Shelter for thirty days after her suspension. The Court notes that Lee's and Sylvester's statements provide corroborating accounts as to the terms of suspension they discussed with Plaintiff that day.[4] Plaintiff simply having a different recollection of what transpired during that conversation has no bearing on whether Lee and Sylvester intentionally portrayed a false narrative to the police.

---

[3] Plaintiff also contends that Garcia provided false information to law enforcement and the "initiation element" is satisfied as to him. (See Opp'n at 18-19.) The Court is not considering this argument because Garcia is no longer a defendant to this lawsuit.

[4] To the extent Plaintiff argues that Lee did not have the authority to prohibit her from returning to the Shelter, this argument is immaterial to the core issue of whether Plaintiff "knew" she was not authorized to do so.

Plaintiff then points to the Criminal Trespass Affidavit that was prepared by Valentine, particularly, his statement that Plaintiff did not have permission to enter the Shelter on February 18, 2017.  Admittedly, Valentine was not present when Plaintiff was given the Suspension Letter by Lee, Sylvester, and Garcia, nor did he play a personal role in doing so.  (Valentine Depo. Tr. at 12.)  However, as the Director of Public Safety, Valentine oversaw Lee, Sylvester, and Garcia.  (See id. at 7-11.)  And Valentine's employees routinely tell individuals who are suspended, like Plaintiff, that they "are not to return to the facility" after their suspensions.  (Id. at 16.)  Valentine's deposition does not suggest that he had reason to believe Lee (or Sylvester or Garcia) did not tell Plaintiff she could not go back to the Shelter after her suspension to render his statement knowingly false.

Next, Plaintiff addresses DeSanti's statement which provides, inter alia, that Plaintiff "was told by public safety she is not allowed to come to the shelter since she was suspended." DeHoyos's statement similarly states that "Plaintiff was told not to come to the Shelter while she was on suspension," and notes that after Plaintiff was escorted from the Shelter on February 18, 2017, public safety told Plaintiff "not to come back until told otherwise."  Plaintiff contends both statements are false based upon her contention that Plaintiff was never told not

to return.  In addition, Plaintiff contends DeSanti's statement is false or even misleading because DeSanti never heard public safety tell Plaintiff she could not go back to the Shelter, her "whole basis of knowledge about what happened that day was based on what 'somebody' may have told her," and that her "recollection of what Public Safety publicly told the employees about Hansen's suspension was solely that she was suspended and escorted out of the building."  (See Opp'n at 15.)

Similar to Valentine, neither DeSanti nor DeHoyos for that matter were in the room when Plaintiff was purportedly told (or not told) she could not return to the Shelter.  However, the Court disagrees with Plaintiff's characterization of DeSanti's deposition testimony to the extent that Plaintiff implies DeSanti had no knowledge that Plaintiff could not go back to the Shelter. DeSanti testified that she believed Garcia informed the Shelter employees that Plaintiff "was suspended and wasn't allowed back in" to the Shelter.  (DeSanti Depo. Tr. at 29, ECF No. 42-8.) Putting aside the fact that DeSanti's statement seems to have been relied upon by law enforcement to establish that Plaintiff was at the Shelter on February 18, 2017 rather than Plaintiff's knowledge of her ability to enter the Shelter (see Breyer Aff. ¶ 8), there is no indication DeSanti provided this aspect of her statement with any knowing falsity.  As to DeHoyos, the Court was not provided with a copy of her deposition transcript and is unable to

examine the veracity of her statement.  Thus, in light of the burden Plaintiff bears to create an issue of fact, she has not proffered sufficient evidence to call into question DeHoyos' statement.

Plaintiff also argues that DeSanti gave law enforcement "the misleading impression that Hansen was present [at the Shelter] for some nefarious reason" because DeSanti suggested that employees were "stressed and worried" Plaintiff was there, such that they "were in the back hiding from her," and that DeSanti thought Plaintiff was there to "harass" her.  (See Opp'n at 16 (quoting DeSanti Stmt.).)  Assuming arguendo that DeSanti knew this information was false, it is immaterial, because it has no bearing on the ultimate crime of trespass with which Plaintiff was charged.  See Jorgensen v. County of Suffolk, No. 11-CV-2588, 2021 WL 4144984, at *6 (E.D.N.Y. Sept. 1, 2021) (discussing "the proposition that [knowingly] conveying non-material false information to prosecutors is insufficient to establish initiation").

In addition to arguing that each of the foregoing statements were false, Plaintiff also contends that they are contradictory to the extent that Garcia and Lee indicated Plaintiff could not return to the Shelter for thirty days after her suspension whereas Valentine, DeSanti, and DeHoyos simply stated Plaintiff could not return.  This, however, is not an issue of

material fact.  It is undisputed that Plaintiff was suspended on February 7, 2017 and that she returned to the Shelter on February 18, 2017.  As such, it is inconsequential whether Plaintiff was told not to return for thirty days or indefinitely because she returned to the Shelter eleven days after being suspended, which falls within the smallest iteration of the potential time frame Defendants believed she was prohibited from going to the Shelter.

Accordingly, Plaintiff cannot create an issue of material fact with respect to Defendants' decision to initiate criminal proceedings against her, as she is unable to demonstrate that Valentine impermissibly encouraged Detective Beyrer to charge Plaintiff or that Defendants knowingly provided false information to law enforcement.  <u>Mitchell v. Victoria Home</u>, 434 F. Supp. 2d 219, 228 (S.D.N.Y. 2006).  As such, Plaintiff's claim for malicious prosecution fails, and the Court need not address the remaining elements at issue.

2.  <u>Qualified Immunity</u>

However, even if Defendants were found responsible for initiating Plaintiff's prosecution, Defendants' motion for summary judgment would still be granted on the grounds of qualified immunity.  To rebut Defendants' qualified immunity defense, Plaintiff argues that "[n]o person could find it reasonable to prosecute Hansen for such a minor petty offense or for trying to attend a volunteer orientation open to the public in a public

building," especially so because Plaintiff "peacefully and immediately left the Shelter without incident . . . and did not return." (See Opp'n at 25.)  The ultimate legality or success of Plaintiff's prosecution, however, does not absolve Defendants' entitlement to qualified immunity.  In other words, Plaintiff's argument has no bearing on whether Defendants reasonably believed their statements to law enforcement were made in violation of Plaintiff's right to be free from malicious prosecution, particularly, that such statements crossed the threshold from the mere reporting of a crime to the initiation of criminal proceedings against Plaintiff.

Accordingly, under the circumstances of this case, it was objectively reasonable for Defendants to believe they "came within the safe harbor for the 'mere reporting' of suspected crime," thus entitling [them] to qualified immunity. Rohman, 215 F.3d at 217-18 & n.5) ("But even if truth and completeness are required to avoid liability for malicious prosecution, the issue for purposes of qualified immunity is not whether the information that [defendant] gave the police was true and complete, but whether it was objectively unreasonable for [defendant] to believe that the information he gave the police was true and complete.  There is nothing in the record to indicate that [defendant] believed that the information he gave to the police was false or incomplete, save only the apparent inability of the prosecutors ultimately to

confirm the information sufficiently to warrant ultimate prosecution. If [defendant's] assertion was false, as [plaintiff] claims, that without more would not permit the inference that he knew or thought that the assertions he made to the police were false at the time that he made them.").

CONCLUSION

For the stated reasons, IT IS HEREBY ORDERED that Defendants' motion for summary judgment (ECF No. 42) is GRANTED. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March 28, 2022
        Central Islip, New York